**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 12-cv-00337-RM-MJW

JEFF BROSH, and
JOHN COON,

      Plaintiffs,

v.

LINDA DUKE, in her individual capacity,

      Defendant.

---

**ORDER ON
DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT (ECF NOS. 35 & 59)**

---

      Plaintiffs Jeff Brosh and John Coon, then prisoners working in the Fremont Correctional Facility ("FCF") kitchen, allege that Defendant Linda Duke, a correctional officer, maliciously and sadistically locked Plaintiffs in a walk-in refrigerator for no legitimate penological purpose. This matter is now before the Court on Defendant's two motions for summary judgment. In her first motion (ECF No. 35), Defendant seeks dismissal of Mr. Brosh's claims as barred under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §§ 1997e *et seq.* In her second motion (ECF No. 59), Defendant seeks dismissal of Plaintiffs' claims based on qualified immunity. Upon consideration of the motions, the Court file, and the applicable statutes, rules and case law, and being otherwise fully advised, the Defendant's Motions for Summary Judgment are GRANTED.

      **I.    STANDARD OF REVIEW**

      Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).  Whether there is a genuine issue of material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or, conversely, is so one-sided that one party must prevail as a matter of law.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000).  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"At the summary judgment stage, the parties need not submit evidence in a form admissible at trial; however, the content or the substance of the evidence must be admissible." *Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1122 (10th Cir. 2005); *see* Fed.R.Civ.P. 56(e). Thus, "(1) the content of summary judgment evidence must be generally admissible and (2) if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant*, 432 F.3d at 1122.

The standard of review, however, differs in evaluating a motion for summary judgment based on a defense of qualified immunity.  *Smith v. Cochran*, 339 F.3d 1205, 1211 (10th Cir. 2003).  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (10th Cir. 2009) (internal quotation marks omitted).  Because of the underlying purposes of

qualified immunity, "[w]hen a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff to satisfy a strict two-part test: first, the plaintiff must show that the defendant's actions violated a constitutional or statutory right; second, the plaintiff must show that this right was clearly established at the time of the conduct at issue." *Roja v. Anderson*, 727 F.3d 1000, 1003 (10th Cir. 2013) (internal quotation marks omitted); *Smith*, 339 F.3d at 1211.

In determining whether the right was "clearly established," the court must assess the objective legal reasonableness of defendant's action at the time of the alleged violation and ask whether the contours of the right were sufficiently clear that a reasonable official would understand that what he or she is doing violates that right. *Holland ex rel Overdorff v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001).

> Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains. The Supreme Court has held a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful. As this court has pointed out, the *Hope* [ *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)] decision shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional.

*Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010) (internal quotation marks, citations and alterations omitted); *Casey v. City of Fed. Heights,* 509 F.3d 1278, 1284 (10th Cir. 2007).

In determining whether a plaintiff has satisfied this initial burden, the court must view the facts and draw reasonable inferences in a light most favorable to plaintiff as the party opposing summary judgment. *Rojas*, 727 F.3d at 1004 n.5. This ordinarily means "'adopting ... the

plaintiff's version of the facts.'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007); ellipsis in original). The court has discretion to address the two-part test in whatever order is appropriate under the circumstances. *Pearson*, 555 U.S. at 236; *Toevs v. Reid*, 685 F.3d 903, 910 (10th Cir. 2012).

## I. FACTUAL BACKGROUND[1]

### A. The Incident.

At all relevant times, Plaintiffs Brosh and Coon were prisoners incarcerated at the FCF who worked in the kitchen under the direction of Sergeant Rhonda Wheeler, a correctional officer ("CO"). (ECF No. 59-1, Duke Deposition (Dep.), pages (pp.) 7, 8.)[2] Plaintiffs' dinner shift duties typically ran from about 3:00 p.m. to 7:30 or 8:00 p.m. (ECF No. 59-6, Ransier Dep., pp. 5 & 12.) The last inmate count of the evening was around 9:25 p.m. (ECF No. 69-2, Ransier Dep., p. 13.)

On February 12, 2012, at approximately 6:00 p.m., and as part of their regular duties, Plaintiffs brought leftover milk to the kitchen cooler ("Cooler"). (ECF No. 59-4, Coon Dep., pp. 24, 30; No. 69-1, Brosh Dep., pp. 23, 30; No. 69-5, Incident Report.) It appears that Plaintiffs were also supposed to be at the Cooler to assist Sergeant Wheeler in pulling food for the next morning. (ECF No. 69-4, Wheeler Dep., p. 7.)

---

[1] To the extent the Court relied on any other facts, they are included in the Analysis.
[2] The cited page numbers are to the page of the deposition or other document referenced, and not to the page number of the CM/ECF filing.

Defendant was present with another prisoner[3] at the Cooler. There was either no interaction between Defendant and Plaintiffs or, at most, Defendant indicated Plaintiffs could go into the Cooler. (ECF No. 69-1, pp. 27-28; No. 69-3, p. 31.) Plaintiffs walked into the Cooler to put their milk pallets away when Mr. Brosh noticed that Defendant had closed the Cooler door. (ECF No. 69-1, pp. 28-29.) Without a word to Plaintiffs, Defendant had walked out of the Cooler, shut the door, and locked the padlock. (ECF No. 59-1, pp. 44, 84; No. 59-4, p. 32.) When Mr. Coon looked out the window of the Cooler, he saw a bread rack in front of the window. (ECF No. 75-2, p. 74.)[4]

Plaintiffs banged, kicked and/or beat on the Cooler door, screamed, and repeatedly pushed on the large knob on the door as instructed by a large, visibly printed, but partially scratched off, yellow sticker on the door. That sticker stated "You Are Not Locked In." Plaintiffs, however, were unable to open the door. (ECF No. 59-1, p. 83; No. 69-1, pp. 29, 39-40; No. 59-4, pp. 32, 40-41; No. 59-11, Photo of Sticker.) Unbeknownst to Plaintiffs, they had to do more than push to exit – they had to turn the knob and unscrew it. (ECF No. 59-1, p. 84.) Neither Plaintiff was given any training on how to get out of the refrigerator. (ECF No. 59-1, p. 84; No. 69-1, p. 96; No. 69-4, p 17.) The temperature check at 5:41 p.m. that evening showed the Cooler was 39 degrees. (ECF No. 59-3, p. 91; No. 59-7, Daily Refrigeration Log.) Plaintiffs, however, felt the temperature in the Cooler was at or near freezing. (ECF No. 69-3, p. 38.)

---

[3] The evidence appears inconsistent as to whether Defendant had two prisoners helping her or one. (ECF No. 69-1, p. 27 (two offenders); No. 69-5 (one offender).) The Court finds the inconsistency is immaterial under the facts and circumstances of this case.

[4] Although this fact is disputed, at this juncture, the Court considers the material facts as they were alleged by the non-moving party. *Despain v. Uphoff*, 264 F.3d 965, 972 & 977 (10th Cir. 2001).

While Plaintiffs were locked in the Cooler, Defendant went about her work. (ECF No. 59-1, pp. 8-9.) All kitchen staff have radios which work everywhere in the kitchen. (ECF No. 69-4, p. 25.) Nonetheless, Defendant did not call anyone for assistance to deal with Plaintiffs, advise anyone about what she had done, or advise anyone to let them know Plaintiffs were locked in the Cooler. (ECF No. 59-1, pp. 7-9.) Meanwhile, Sergeant Wheeler saw the Cooler was locked, scanned the kitchen but did not see Plaintiffs at the Cooler, so went to get another inmate to help her pull food for the next shift. (ECF No. 69-4, pp. 13-14.) Sergeant Wheeler estimated she did not return to the Cooler for approximately 10-12 minutes. (ECF No. 59-2, p. 8.)

When Sergeant Wheeler arrived back at the Cooler with her new inmate, she saw a face staring at her from within the Cooler, realized it was locked and released Plaintiffs. (ECF No. 59-2, p. 8.) Sergeant Wheeler saw that both Plaintiffs were distraught, angry, emotional, scared, and physically upset from the incident. They were shaking, but Sergeant Wheeler did not know whether it was from emotion or cold. (ECF No. 69-4, pp. 11-12.) Mr. Brosh estimated Plaintiffs were in the cooler 20-30 minutes before Sergeant Wheeler found them and let them out. (ECF No. 69-1, p. 30.)

Sergeant Wheeler went to the staff office and called the shift commander to let her know there was an incident. Defendant was also present. (ECF No. 69-4, p. 9.) Sergeant Wheeler saw no penological purpose for locking Plaintiffs in the Cooler. (ECF No. 69-4, p. 15.) She believed that locking inmates in a freezer raised safety issues, such as fires, or if the inmates were mortal enemies. (ECF No. 69-4, p. 15.) Sergeant Wheeler also thought Defendant acted out of spite,

saying "We both know there's no love lost between us, but when you pick on my inmates, that's different." (ECF No. 70, Exhibit 9, Recording of February 23, 2010 Meeting.)[5]

After Sergeant Wheeler let Plaintiffs out, Plaintiffs confronted Defendant. According to Plaintiffs, Defendant said "Oh, I see someone let you out," and admitted she locked Plaintiffs in on purpose and would "do it again." (ECF No. 69-1, p. 44; No. 69-3, p. 50.) Defendant counters that she had intended to go back to Plaintiffs after she completed her work. (ECF No. 59-1, pp. 7-9.)

Defendant inconsistently explained *why* she locked Plaintiffs in the Cooler. Her testimony and arguments are contradictory as to whether she locked the padlock so that nobody could get in the Cooler, or so that Plaintiffs could not get out of the Cooler, or both. (ECF No. 59-1, p. 84 (in and out); No. 59, p. 4, ¶18 ("keep other offenders from getting *into*" Cooler; italics in original), p. 10 ("temporary contain Plaintiffs"), p. 11 ("temporarily confine Plaintiffs inside"); No. 75, p. 2, ¶18 ("both").) She also presented evidence that about a month before the incident a sergeant had been attacked, and that she locked Plaintiffs in to protect herself. (ECF No. 59-1, pp. 44, 87.) Defendant, however, had no bad interactions with either Plaintiff in the past. (ECF No. 59-1, p. 31.) Further, although she testified she intended to return to the Cooler to deal with Plaintiffs, there is no indication that she intended to return with someone to assist her. (ECF No. 59-1, pp. 7-9.) And, in her Incident Report, she stated she locked Plaintiffs in, in order to "teach these offenders that they [cannot] just go through a door because it opened." (ECF No. 69-5.)

---

[5] Defendant admitted this statement was made. (ECF No. 75, p. 4, ¶44.)

As a result of the incident, Mr. Brosh has issues with cold with his left hand and with pain in his right foot. (ECF No. 69-1, p. 76.) In addition, he has problems with self-esteem and enclosed spaces. (ECF No. 69-1, pp. 77, 84.) Mr. Coon had a panic attack the next time he returned to the kitchen. (ECF No. 69-3, pp. 54-55.) He also has nightmares and problems with trust. (ECF No. 69-3, pp. 60-61, 76.)

On April 12, 2010, after conducting an investigation, the FCF Associate Warden found Defendant's actions constituted "willful misconduct" and directly affected the safety and security of the FCF. (ECF No. 69-9, p. 6; No. 75, p. 4, ¶47.)

### B. The Reporting of the Incident.

The incident occurred the evening of February 12, 2010. At that time, Mr. Brosh was serving a life sentence. (ECF No. 50-2, ¶19.) He was eligible to be considered for a multi-phase therapy in April of 2010, which therapy is required in order to be considered for and/or released on parole.[6] (ECF No. 50-3, ¶78; No. 55-1, p. 100.)

The Colorado Department of Corrections ("CDOC") has adopted Administrative Regulations to provide inmates with administrative remedies through a grievance process. (ECF No. 35-2, DeCesaro Aff., ¶4.) Inmates may file grievances asserting that staff members have used excessive force against them. (ECF No. 35-2, ¶9.) Mr. Brosh did not file any grievances concerning the alleged use of force by staff arising from the February 12, 2010 incident. (ECF No. 35-2, ¶11; No. 55-1, Brosh Dep., p. 58.) Disregarding impermissible hearsay relied upon by Mr. Brosh, his reasons for not doing so are as follows.

---

[6] The parties' dispute over whether parole is possible *prior* to the completion of therapy is not material under the facts and circumstances in this case.

Immediately following the incident, Mr. Brosh told Lieutenant Pryor that the DOC must investigate the incident because Defendant locked him and Mr. Coon in the Cooler on purpose. (ECF No. 50-3, ¶¶17 & 20.) After the incident, Mr. Brosh was approached about the incident by inmates from not only his entire pod but also the entire FCF. (ECF No. 50-3, ¶¶30-31.) Mr. Brosh also discussed the incident with Captain Vendetti and Dr. Graham. (ECF No. 50-3, ¶¶44, 47, 49, 53.) On April 17, 2010, Mr. Brosh discussed the incident with his case worker Rick Lawson, who offered him the paperwork to file a step 1 grievance.[7] (ECF No. 50-3, ¶¶54, 56.) Mr. Brosh initially declined but changed his mind and obtained the form from Mr. Lawson the next day, April 18, 2010. (ECF No. 50-3, ¶¶56-58; No. 55-1, p. 57.) Thereafter, when raised by CO Shumate, Mr. Brosh told him about the incident as well. (ECF No. 50-3, ¶61.) CO McHenry, now deceased, also approached Mr. Brosh about the incident. (ECF No. 55-1, pp. 63, 68.)

After the incident, Mr. Brosh was reassigned to the diet room in the kitchen and had daily occasion to see Defendant. Defendant said nothing inappropriate or made any threats against Mr. Brosh. (ECF No. 55-1, pp. 35-37.) Neither Lieutenant Pryor, Captain Vendetti, CO Shumate nor CO McHenry ever threatened Mr. Brosh. (ECF No. 55-1, pp. 60-63, 65.) He "felt" a veiled threat by Lt. Pryor but thought Captain Vendetti was very helpful and CO McHenry spoke to him almost like a "friend." (ECF No. 55-1, pp. 60, 62, 65.) Lieutenant Pryor, however, denies ever speaking to either Plaintiff about the incident. (ECF No. 55-5, p. 14.)

At the time of the incident, Mr. Coon was serving a four-year sentence with a mandatory release date of October 2011. (ECF No. 50-2, ¶¶6, 19, 47.) He also discussed the incident with

---

[7] A step 1 grievance is the first step in the three-step administrative process. (ECF No. 35-2, ¶¶4-8.)

his case manager and an unknown male Lieutenant. (ECF No. 50-2, ¶¶28, 35, 37.) Mr. Coon stated that if he were in Mr. Brosh's shoes – trying to get into group therapy – he would not have filed a grievance because he believed if Mr. Brosh complained, he would be kicked out of the group. (ECF No. 50-2, ¶44.)

Mr. Brosh was paroled on September 24, 2011. (ECF No. 55-1, p. 100.) Mr. Coon was released from prison in October 2011, as anticipated. (ECF No. 50-2, ¶¶47-48.) Plaintiffs filed this action on February 9, 2012. (ECF No. 1.)

## II. ANALYSIS

### A. Exhaustion of Administrative Remedies.

Defendant argues Mr. Brosh's claim must be dismissed because he failed to exhaust his administrative remedies. On this record, the Court agrees.

Under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), a prisoner is required to exhaust available administrative remedies. This requirement is mandatory. *Woodford v. Ngo*, 548 U.S. 81, 85 (2006); *Tuckel v. Grover*, 660 F.3d 1249, 1252 (10th Cir. 2011). "[W]hen a prison official inhibits an inmate from utilizing an administrative process through threats or intimidation, [however], that process can no longer be said to be 'available.'" *Tuckel*, 660 F.3d at 1252-1253.

"Failure to exhaust under the PLRA is an affirmative defense." *Tuckel*, 660 F.3d at 1254. A defendant bears "the burden of asserting and proving that the plaintiff did not utilize administrative remedies. Once a defendant proves that a plaintiff failed to exhaust … the onus falls on the plaintiff to show that remedies were unavailable to him as a result of intimidation by prison officials." *Tuckel*, 660 F.3d at 1254. In order to do so, an inmate must show:

> (1) that the threat or intimidation actually did deter the plaintiff inmate from lodging a grievance or pursuing a particular part of the prison administrative process; and (2) that the threat or intimidation would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance or pursuing the part of the prison administrative process that the inmate failed to exhaust.

*Tuckel*, 660 F.3d at 1254. "The first showing is subjective; the inmate must show that he was actually deterred." *Tuckel*, 660 F.3d at 1254. The second showing is objective, requiring this Court to consider the context of the alleged threat or intimidation. *Tuckel*, 660 F.3d at 1254. "Only threats that are sufficiently serious and retaliatory acts that are severe enough to deter a reasonable inmate" will result in an "unavailable" administrative remedy. *Tuckel*, 660 F.3d at 1254.

In this case, Mr. Brosh's evidence falls short of showing administrative remedies were unavailable to him. Mr. Brosh admits that no one threatened him. Instead, he relies mainly on inadmissible hearsay to show that he was explicitly or implicitly discouraged from filing a grievance. He relies on alleged instructions not to discuss the incident but the evidence shows that he nonetheless repeatedly did so. Indeed, it appears the entire FCF was aware of and approached him about the incident. His concerns are also based on unsubstantiated generalities, such as how COs always have each other's backs, and speculations about what may occur to an inmate if he or she should cross a guard or file a grievance. Such vague and/or implied "threats" and generalities are simply insufficient. Accordingly, even assuming, *arguendo*, that Mr. Brosh was subjectively deterred from filing a grievance, for fear of retaliation or other reprisal, the Court finds his fears or concerns were not objectively reasonable. As such, administrative remedies were not "unavailable."

### B. Qualified Immunity.

Defendant argues she is entitled to qualified immunity on Plaintiffs' Eighth Amendment claim alleging excessive force. The Court finds that although Plaintiffs have shown that their Eighth Amendment right to be free from the use of excessive force – here, being locked in a Cooler for no penological reason – was violated, they have not shown that such right was clearly established at the time of the conduct at issue.

It is well established that the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment under the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). What is necessary to establish an "unnecessary and wanton infliction of pain" varies according to the nature of the alleged constitutional violation. *Hudson*, 503 U.S. at 5. Where the nature of the claim is for excessive force, two prongs are considered: "(1) an objective prong that asks if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and (2) a subjective prong under which the plaintiff must show that the officials acted with a sufficiently culpable state of mind." *Graham v. Sheriff of Logan County*, 741 F.3d 1118, 1123 (10th Cir. 2013) (internal quotation marks omitted); *Smith*, 339 F.3d at 1212).

"The subjective prong turns on whether the officer acted maliciously and sadistically." *Graham*, 741 F.3d at 1123; *Smith*, 339 F.3d at 1212. "Where no legitimate penological purpose can be inferred from a prison employee's alleged conduct, … the conduct itself constitutes sufficient evidence that force was used maliciously and sadistically for the very purpose of causing harm." *Graham*, 741 F.3d at 1123 (internal alterations and quotation marks omitted).

"As for the objective prong, it does not require that a prisoner show a 'significant injury' to pursue an Eighth Amendment claim." *Graham*, 741 F.3d at 1123 (quoting *Wilkins v. Gaddy*,

12

559 U.S. 34, 37 (2010)). "Instead, the inquiry centers on the nature of the force used." *Graham*, 741 F.3d at 1123 (internal quotation marks omitted). "Although the extent of the injury suffered may be instructive in determining the amount of force used, a minor injury can still support an Eighth Amendment claim if the force used was non-trivial and was applied maliciously and sadistically to cause harm." *Graham*, 741 F.3d at 1123 (internal quotation marks omitted). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 9.

The "core judicial inquiry" in an excessive force claim is not "whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins*, 559 U.S. at 37.

In this case, viewing the evidence in the light most favorable to Plaintiffs, Defendant's locking of Plaintiffs in the Cooler violated their constitutional right to be free from the use of excessive force. Here, Plaintiffs were performing their workday duties by carrying leftover milk into the Cooler when Defendant let them in and then, without a word, closed and padlocked the Cooler. Plaintiffs neither said a word to Defendant nor acted out in any way toward Defendant. Their interaction was brief. Defendant did not notify anyone about what she had done or Plaintiffs' whereabouts. Instead, Defendant continued with her work. No legitimate penological purpose can be inferred from the evidence surrounding Defendant's conduct. Instead, Plaintiffs presented evidence to support their theory that Defendant locked them in the Cooler because she had a feud with Sergeant Wheeler, Plaintiffs' supervisor. In other words, that she applied force maliciously and sadistically to cause harm when no force was warranted at all. As for Plaintiffs'

injuries, although they are relatively minor or modest, significant injury is not necessary to establish their Eighth Amendment violation under such facts and circumstances.

The inquiry, of course, does not end here. Plaintiffs must also establish that this right was clearly established at the time of the conduct at issue. This, they have not done.

Here, Plaintiffs rely on: (1) a prior Order[8] finding, at the Rule 12(b)(6) stage of the proceedings, that Defendant had sufficient notice that her conduct was unlawful; and (2) *Despain v. Uphoff*, *supra*, for the general proposition that Defendant had sufficient "notice" that maliciously and sadistically using force for the purpose of causing harm violates Plaintiffs' constitutional rights. Plaintiffs' reliance on the prior Order is misplaced as it addressed a motion to dismiss and not a fully developed record as that now before the Court. Similarly, *Despain, supra*, does not support a finding for Plaintiffs under the facts and circumstances of this case.

While Plaintiffs are not required "to produce a factually identical case, but [are] allow[ed] *some* degree of generality in factual correspondence," *Smith*, 339 F.3d at 1215 (italics added), their reliance on the general rule that the use of excessive force against an inmate for no penological purpose is unlawful as providing sufficient notice to Defendant asks too much. Under the facts and circumstances of this case, Plaintiffs have not shown that the relied upon general constitutional rule can apply with obvious clarity to Defendant's conduct. Indeed, Plaintiffs initially brought this action alleging such conduct constitutes a failure to provide them with humane *conditions of confinement,* not force. (ECF Nos. 1 (Complaint) & 15 (Response to Motion to Dismiss).) Next, although the Cooler was cold, it was above freezing; contained food; was lit; measured approximately 25 feet by 16 feet; and had two doors. (ECF No. 59-3, pp. 25-

---

[8] At that time, this case was assigned to the Honorable Christine M. Arguello. (ECF No. 25.)

26; No. 59-6, p. 12; No. 59-11.) Further, Defendant was aware that Sergeant Wheeler was supervising Plaintiffs and it was near the end of the dinner shift when Plaintiffs would be expected to return to their cells; that there was a yellow "You Are Not Locked In" sticker on the Cooler door and that a person could unlock the Cooler from the inside; and that inmates should have been oriented on how to unlock themselves out of the Cooler, and she had in fact done so with the cooks she supervised. (ECF No. 59-1, pp. 7-8, 83-84.) Finally, although a factually identical case is not required, Plaintiffs have pointed to no analogous case and the Court's independent research revealed none.[9] Under such circumstances, it cannot be said that the general constitutional rule already identified applies with obvious clarity such that Defendant was put on fair notice that her conduct rose to a constitutional violation.

### III. CONCLUSION

Mr. Brosh has failed to exhaust his available administrative remedies. Further, even, assuming, *arguendo*, Mr. Brosh has presented sufficient issues of disputed material facts to preclude the granting of summary judgment for Defendant on this issue, his – and Mr. Coon's – claim nonetheless fails as Defendant is entitled to qualified immunity. It is therefore

ORDERED that Defendant's Motion for Summary Judgment (ECF No. 35) against Plaintiff Jeff Brosh for failure to exhaust administrative remedies is GRANTED; and it is

FURTHER ORDERED that Defendant's Motion for Summary Judgment (ECF No. 59) against both Plaintiffs based on qualified immunity is GRANTED; and it is

FURTHER ORDERED that Plaintiffs' complaint is dismissed with prejudice; and it is

---

[9] Judge Arguello was unable to find a factually identical case. (ECF No. 25, p. 13.)

FURTHER ORDERED that the Clerk of the Court shall enter judgment in favor of Defendant and against Plaintiffs Jeff Brosh and John Coon; and it is

FURTHER ORDERED that Defendant is awarded costs and shall within 14 days of the date of this Order file a bill of costs, in accordance with the procedures under Fed.R.Civ.P. 54(d)(1) and D.C.COLO.LCivR 54.1, which shall be taxed by the Clerk of the Court.

DATED this 25th day of August, 2014.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge